1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10

AMERIPRISE FINANCIAL SERVICES, LLC,

Plaintiff,

v.

DOUGLAS KENOYER, an individual and LPL
FINANCIAL LLC,

Defendants.

NO. 2:24-cv-01675

**PLAINTIFF'S MOTION FOR
TEMPORARY RESTRAINING ORDER
AND ORDER TO SHOW CAUSE**

NOTE ON MOTION CALENDAR:

October 14, 2024

ORAL ARGUMENT REQUESTED

## I.    RELIEF REQUESTED

Plaintiff, Ameriprise Financial Services, Inc. ("Ameriprise" or "Plaintiff"), respectfully

moves this Court for a Temporary Restraining Order ("TRO") enjoining Douglas Kenoyer

("Kenoyer"), a former Ameriprise financial advisor, and LPL Financial, LLC ("LPL," collectively

with Kenoyer the "Defendants") from: (i) violating the restrictive covenants that apply to Kenoyer's

employment with Ameriprise as well as Kenoyer's fiduciary duties to Plaintiff; and (ii)

misappropriating Plaintiff's trade secrets. Although a showing of actual misappropriation is not

required for the entry of an injunction pursuant to the Washington Uniform Trade Secrets Act

FOSTER GARVEY PC
1111 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-3296
PHONE (206) 447-4400 FAX (206) 447-9700

("UTSA"), such a showing is made here, as discussed below. Ameriprise has spent years cultivating its confidential client relationships. Unless enjoined, Defendants will destroy these efforts.

## II.    <u>PRELIMINARY STATEMENT</u>

This action for injunctive relief arises out of Kenoyer's sudden departure from Ameriprise and immediate reaffiliation with competitor LPL. Prior to his departure, Kenoyer improperly pre-solicited Ameriprise clients to follow him to LPL and now continues to improperly solicit Ameriprise's clients on LPL's behalf. Moreover, Kenoyer and LPL continue to possess and make use of confidential client information which Kenoyer misappropriated from Ameriprise. Defendants utilize this misappropriated information to, *inter alia*, effectuate the improper solicitations of Ameriprise's clients. This Court should immediately halt Defendants' misconduct.

Kenoyer is likely to claim that he is shielded by the Protocol for Broker Recruiting (the "Protocol"). However, Kenoyer repeatedly violated the Protocol by, for example, pre-soliciting clients and misappropriating confidential information related to ineligible clients. An advisor's violation of the Protocol forfeits the protections of the Protocol entirely. **<u>Therefore, Kenoyer is not able to claim the Protocol protects him in any respect.</u>** As Kenoyer violated the Protocol, the terms of Kenoyer's agreements with Ameriprise, which prohibit the taking of any confidential information and the solicitation of any client*,* apply to Kenoyer's transition to LPL.

Kenoyer is engaging in this misconduct with the knowledge and support of LPL, whose regular pattern and practice is to encourage recruits to violate their contractual agreements.

Kenoyer's conduct constitutes multiple and separate violations of the Protocol, his contractual obligations with Ameriprise, FINRA's requirement for integrity and truthfulness, and both common and statutory law. Ameriprise therefore seeks damages from Kenoyer for his misconduct and loss of revenue due to improper solicitation of Ameriprise's clients and from LPL for encouraging, aiding, and abetting such misconduct by Kenoyer. Accordingly, this Court should enjoin Defendants to prevent further irreparable harm to Ameriprise.

FOSTER GARVEY PC
1111 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-3296
PHONE (206) 447-4400 FAX (206) 447-9700

### III.    STATEMENT OF FACTS

**A. Plaintiff Ameriprise Financial Services, Inc.**

Ameriprise is a national broker dealer, a leader in the financial planning and wealth management industry, and Financial Industry Regulatory Authority ("FINRA") member. Ameriprise is registered with the SEC, all fifty states, and Puerto Rico. Through Ameriprise, Kenoyer provided professional financial and investment advisory services to individual customers from 2006 to 2024.

Ameriprise's continued success depends on establishing and maintaining client relationships. For that reason, Ameriprise invests substantial time and money – totaling millions of dollars – in acquiring, developing and maintaining its client list. Ameriprise expends funds on marketing, advertising and other efforts to generate clients organically by establishing goodwill in the greater Washington community.

Because providing top-quality service is critical to maintaining client relationships, Ameriprise also expends significant resources to service its clients. Specifically, Ameriprise spends thousands of dollars annually for support staff, systems and support, management, salaries, annual registration fees, computer services and equipment, phone, mail, literature, training seminars, trade and other professional news publications, promotional events, securities research and analysis, and other services with the aim of providing its employees and affiliates with resources so that they can better service (and therefore enhancing the firm's relationships with) Ameriprise's clients. It typically takes many years of servicing clients for Ameriprise to become their primary investing firm. Ameriprise has built the loyalty and trust of its client base through many years of effort and has invested untold sums in building Ameriprise's goodwill.

**B. Defendant Douglas Kenoyer Joins Ameriprise and Executes the Ameriprise Franchise Agreement**

On or about April 26, 2006, Kenoyer became affiliated with Ameriprise. Eventually, Kenoyer became an Independent Franchise Advisor. In exchange for providing access to its confidential and proprietary information, and for providing him with training, Ameriprise required

F O S T E R  G A R V E Y  P C
1111 T HIRD A VENUE , S UITE 3000
S EATTLE , W ASHINGTON 98101-3296
P HONE (206) 447-4400 F AX (206) 447-9700

1    Kenoyer to enter into an Independent Advisor Business Franchise Agreement ("Franchise

2    Agreement") with Ameriprise, which he executed on June 1, 2022. Under Section 10(A) of the

3    Franchise Agreement, Kenoyer agreed to protect Ameriprise's confidential information:

> Independent Advisor has or may have access to Ameriprise Financial confidential
> information and trade secrets that Independent Advisor agrees has great value to
> Ameriprise Financial. Independent Advisor agrees that because of such access,
> Independent Advisor is in a position of trust and confidence with respect to this
> information. To protect Client confidentiality, Ameriprise Financial goodwill, trade
> secrets and other proprietary and confidential business information, Independent
> Advisor agrees to not, during the term of this Agreement or anytime thereafter,
> except as permitted under Section 14 regarding transfers of the Independent
> Financial Advisor Business, communicate, divulge, or use for himself or herself
> except pursuant to the System, or for the benefit of any other person, association,
> corporation or partnership any confidential information or trade secrets, including
> but not limited to Client names, addresses, and data and know-how concerning the
> methods of operation of the System and the business franchised hereunder that may
> be communicated to Independent Advisor or of which Independent Advisor may
> be apprised by virtue of Independent Advisor's operation under the terms of this
> Agreement (…)

> Independent Advisor agrees that, without limitation, Client names, addresses, data
> and other personal and financial information contained and recorded in Client
> records are confidential and the property of Ameriprise Financial.

15    Declaration of David Call ("Call Decl.") ¶¶4-7, Exhibit A. Moreover, Section 19(B) of the

16    Agreement restricts solicitation of Ameriprise's clients during Kenoyer's affiliation with Ameriprise

17    and for one year thereafter, stating in relevant part:

> (1) during the term of this Agreement Independent Advisor agrees not to,
> either directly or indirectly, for itself, or through, on behalf of, or in
> conjunction with any person or entity:

> > a) encourage, assist, participate, induce, or attempt to encourage,
> > assist, participate or induce any Client or prospective business or
> > customer to terminate an agreement with Ameriprise Financial,
> > Ameriprise Financial's affiliates, Issuers, or any financial advisor
> > business under the System;

> > (…)

> > c) solicit any Clients that Independent Advisor contacted, serviced
> > or learned about while operating under this Agreement to open an
> > account other than an Ameriprise Financial account or to sell any
> > investment, financial or insurance products or services other than

through Ameriprise Financial with Ameriprise Financial's written approval and consent;

(2) for one year after the expiration or termination of this Agreement, Independent Advisor agrees to not, either directly or indirectly, for itself, or through, on behalf of, or in conjunction with any person or entity:

a) encourage, induce, or attempt to encourage or induce any Client that Independent Advisor contacted, serviced or learned about while operating under this Agreement to terminate an agreement with Ameriprise Financial, Ameriprise Financial affiliates, Issuers, or any financial advisor business under the System;

(…)

c) solicit any clients that Independent Contractor contacted, serviced or learned about while operating under this Agreement for the purpose of the Client opening an account other than an Ameriprise Financial account, purchasing investment, financial, or insurance products or services other than through Ameriprise Financial with Ameriprise Financial's written approval and consent;

*Id.* Ameriprise relied on Kenoyer's assent to the terms of the Agreement and would not have provided him with training or access to its confidential information had Kenoyer not signed the Agreement.

### C. Kenoyer Acquires the Ability to Service Ameriprise Clients via Internal Client Transfer

As a financial advisor at Ameriprise, there are myriad avenues to expand one's business including acquiring the right to service all (or a portion of) another advisor's book of business subject to Ameriprise's review and approval. This process is known as an "Internal Client Transfer." ("ICT"). Shortly before his transition to LPL, Kenoyer took advantage of this avenue to *dramatically* expand his book of business at Ameriprise. On June 1, 2022, Kenoyer acquired the ability to service the entire book of an Ameriprise advisor who intended to retire in short order. *See* Call Decl. ¶10. Thereunder, Kenoyer was able to service **1,031** new clients with **$133,879,806** in assets under management. *Id.*; *see also* Complaint Exhibit C.

In order to service these clients, Ameriprise granted Kenoyer access to extensive confidential financial records and information about Ameriprise's clients, including client identity, address, telephone numbers, transactional history, tax information, personal financial data, banking

1   information and investment objectives, among other confidential and proprietary data. This

2   information—which is not publicly available and cannot be easily duplicated—is proprietary and

3   valuable and would be especially useful to Ameriprise's competitors such as LPL.

4          Accordingly, when permitting such an ICT, Ameriprise requires that the acquiring advisor

5   agree to: (i) maintain the confidentiality of such information; and (ii) not solicit the acquired clients

6   for the period of one year after departure from Ameriprise. Kenoyer agreed to these terms. *See* Call

7   Decl. ¶10. At the time of his resignation from Ameriprise, Kenoyer only had a total of 583 clients

8   and $143,674,511 in assets under management. *See* Call Decl. ¶15. Thus, it is clear that an

9   overwhelming majority of the Ameriprise clients that Kenoyer serviced were from this ICT and

10  subject to the confidentiality and non-solicitation provisions in his Ameriprise contracts.

11         Unbeknownst to Ameriprise, despite his contractual obligations to Ameriprise, Kenoyer

12  quickly parlayed the substantial volume and assets of the clients obtained via this ICT into a large

13  upfront loan from Defendant LPL—who substantially compensated Kenoyer to induce him to move

14  this large book of Ameriprise's clients over to LPL. Kenoyer bragged that LPL was providing him

15  with an upfront as large as $1.2 million to induce Kenoyer to abscond with the confidential

16  information of these clients and to solicit them to join LPL. *See* Declaration of Janel Kinney

17  ("Kinney Decl.") at ¶11.

18  **D. Ameriprise Goes to Great Lengths to Safeguard its Clients' Information.**

19         Ameriprise undertakes significant efforts to maintain its confidential and proprietary

20  information, including, but not limited to, its client records. Specifically, Ameriprise (i) restricts

21  access to its client records to those employees whose jobs require them to refer to this information,

22  (ii) prohibits the duplication of the records, (iii) requires employees to use a secure password to

23  access their computer terminals and the firm's intranet, and (iv) consistently reminds employees

24  about the confidential nature of the information contained in the records and the need to protect it,

25  among other protective measures. *See* Call Decl. ¶3. Employees are repeatedly instructed that they

26  must maintain the strict confidentiality of the client information. *Id.*

FOSTER GARVEY PC
1111 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-3296
PHONE (206) 447-4400 FAX (206) 447-9700

### E. Kenoyer Pre-Solicits Ameriprise Clients and Resigns from Ameriprise

On or about September 5, 2024, Kenoyer submitted his notice of resignation to Ameriprise ("Notice of Resignation"), providing his resignation would be effective on September 19, 2024 and that he would join a direct competitor, fellow Defendant LPL. *See* Call Decl. ¶11. However, prior to his Notice of Resignation it became clear to those around Kenoyer that he was dissatisfied with his current affiliation with Ameriprise. *See* Kinney Decl. ¶6.

It is abundantly clear that Kenoyer pre-solicited clients to follow him to LPL prior to submitting his Notice of Resignation. Kinney assisted Kenoyer in servicing clients Kenoyer received from the large ICT he received in 2022, among others, and thus was intimately familiar with Kenoyer's business. *Id.* at ¶4. In early 2024, Kenoyer informed Kinney that he was moving to a competitor in the financial industry to receive a large upfront loan as he held a significant debt to Ameriprise. *Id.* at ¶6. At that time, Kenoyer also informed Kinney that he pre-solicited clients to move to LPL and expected a good response from clients based on his pre-solicitations. *Id*. Kenoyer started the conversations with his "good" clients and sought pre-commitments from the clients to know how much of his book of business would follow him to LPL. *Id.* Moreover, prior to Kenoyer's Notice of Resignation, numerous Ameriprise clients serviced by Kenoyer approached a different Ameriprise franchise to obtain their services, Cariboo Wealth Advisors ("Cariboo") operated by Bill Eldrige. *See* Declaration of Bill Eldridge ("Eldridge Decl.") ¶4. When asked why they wanted to change advisors, the clients stated that Kenoyer had previously contacted them to say he was leaving Ameriprise and ask them to follow him to his new firm, LPL Financial, LLC ("LPL"), but that they wanted to remain clients of Ameriprise. *Id.* Kinney was able to confirm Kenoyer's pre-solicitation as Kenoyer put notes reflecting same into Ameriprise's client relationship manager platform ("CRM"). *Kinney Decl.* ¶7. For example, Kenoyer's CRM notes reflect conversations clearly constituting pre-solicitation of clients:

> ➢ **June 4, 2024 (107 days before affiliation with LPL)**: "don't think they will come;"

FOSTER GARVEY PC
1111 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-3296
PHONE (206) 447-4400 FAX (206) 447-9700

1       ➢ **July 1, 2024 (80 days before affiliation with LPL)**: "they really didn't want to

2          move;" and

3       ➢ **August 9, 2024 (41 days before affiliation with LPL)**: "not coming with me."

4 Kinney Decl., at ¶7, Exhibit A. Again, these client solicitations pre-dated not only Kenoyer's

5 affiliation with LPL, but even his Notice of Resignation to Ameriprise.

6      In addition to improperly pre-soliciting clients himself, Kenoyer even tried to recruit Kinney

7 to join him at LPL (yet another violation of his contractual obligations) and asked Kinney to

8 similarly engage in pre-solicitation of clients to move their accounts to LPL. *Id.* at ¶8. Kinney

9 recognized Kenoyer's pre-solicitation was inappropriate, and she refused to participate in any pre-

10 solicitation. *Id.* Despite Kenoyer's efforts to solicit Kinney to join LPL, Kinney wanted to remain at

11 Ameriprise Kinney transitioned to another Ameriprise franchise on September 4, 2024, immediately

12 prior to Kenoyer's departure. *Id.* at ¶9, 12.

13      Kenoyer also began consolidating client accounts for his impending transition—i.e., where a

14 specific client would have multiple accounts, Kenoyer would condense the multiple accounts into a

15 single account. *Id.* at ¶10. Kenoyer took these actions because LPL charged a *per account* fee to

16 transition clients over to its platform—thus, the consolidation would minimize expenses for his

17 impending move to LPL. *Id.* Kenoyer's account consolidation was self-interested, not in

18 consideration of the interests of the client(s). *Id.*

19 **F. Defendants Misappropriate Ameriprise's Confidential Information**

20      In addition to improperly pre-soliciting Ameriprise's clients, it is similarly clear that Kenoyer

21 misappropriated *substantial* Ameriprise confidential information—and that Kenoyer and LPL

22 continue to use this misappropriated information to, *inter alia*, continually solicit Ameriprise's

23 clients. *See, e.g.,* Eldridge Decl. ¶7.

24      As referenced above, Kenoyer may attempt to invoke the Protocol for Broker Recruiting

25 (again, the "Protocol"). The "Protocol" is a litigation forbearance agreement specific to the financial

26 industry that governs the conduct of an advisor transitioning between two Protocol-signatory firms.

FOSTER GARVEY PC
1111 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-3296
PHONE (206) 447-4400 FAX (206) 447-9700

1    The Protocol permits an advisor to take only a list of certain clients for whom they are the registered

2    representative of record along with limited contact information for such clients as long as this is the

3    only information the registered representative takes, commonly called a "Protocol List." *See Call*

4    *Decl.* at ¶12. Both Ameriprise and LPL are signatories to the Protocol. *Id.* Both firms maintain

5    various exceptions through their joinder letters to the Protocol; for example, Ameriprise expressly

6    excepts clients acquired through internal transfers from Protocol treatment. *Id.* at ¶16. Thus,

7    Kenoyer's contracts with Ameriprise govern for all clients which he obtained the ability to service

8    through the Internal Client Transfer (*see* §I.C., supra). According to his contractual agreements,

9    Kenoyer was not permitted to retain confidential information for <u>any</u> of these Internal Client

10   Transfer clients. Despite his contractual obligations to the contrary, Kenoyer's purported 'Protocol

11   List' contains droves of confidential information related to these ineligible clients—more than half

12   of the clients on Kenoyer's purported Protocol List were obtained via Internal Client Transfer. *Id.* at

13   ¶15.

14        An advisor must comply with the Protocol, else they forfeit the protections of the Protocol

15   entirely. *Id.* at ¶17; *see also Morgan Stanley Smith Barney LLC v. O'Brien*, No. 3:13-CV-01598

16   VLB, 2013 WL 5962103, at *7 (D. Conn. Nov. 6, 2013) (granting injunction as defendant "breached

17   the spirit and purpose of the Protocol."); *Ameriprise Fin. Servs., Inc. v. Koenig*, No. CIV.A. 11-

18   6140-NLH, 2012 WL 379940, at *5 (D.N.J. Feb. 6, 2012) ("Nowhere in the Protocol does it permit a

19   financial representative to forward confidential client information such as financial plans to a private

20   email address prior to resigning as long as the representative later prepares the appropriate Protocol

21   client lists.") (granting injunction in part). Given Kenoyer's total disregard for the Protocol's terms,

22   he is not able to claim the Protocol protects him in any respect. Accordingly, the terms of Kenoyer's

23   agreements with Ameriprise, which prohibit the taking of any Ameriprise documents or information

24   and the solicitation (and pre-solicitation) of any Ameriprise client formerly serviced by Kenoyer,

25   applies to his transition to LPL.

26

MOTION FOR TEMPORARY RESTRAINING ORDER AND
ORDER TO SHOW CAUSE – 9

1   It must also be noted that, to conduct his everyday business at LPL, it is inherent and

2   necessary that Kenoyer uploaded the misappropriated confidential information to LPL's systems,

3   servers, and devices. *Id.* at ¶19. Both Kenoyer and LPL use this misappropriated information to,

4   *inter alia*, improperly solicit Ameriprise's clients.

5   **G. Defendants' Misconduct Harms Ameriprise**

6   Unfortunately, it appears that Defendants' misappropriation and improper solicitation efforts

7   (including pre-solicitation) have proved successful, as many Ameriprise clients and households, with

8   assets totaling millions of dollars, already have transferred their accounts to Kenoyer at LPL or have

9   otherwise departed Ameriprise. *See* Kinney Decl. ¶ 15; Call Decl. ¶ 20. The full extent of the

10  damages that Ameriprise will suffer from Defendants' misconduct currently unknown and

11  incalculable.

12  **H. Plaintiff's Claims Against Defendants are Subject to FINRA Arbitration.**

13  In connection with his employment as an Independent Advisor of Ameriprise and his

14  affiliation with Ameriprise, Kenoyer executed a Form U-4 Uniform Application for Securities

15  Industry Registration or Transfer. By executing the Form U-4, Kenoyer agreed to submit to

16  arbitration before FINRA all disputes, claims and controversies arising between himself and

17  Plaintiff. Additionally, Rule 13200 of the FINRA Code of Arbitration Procedure for Industry

18  Disputes requires Plaintiff and Defendants to arbitrate disputes they have with each other before a

19  panel of arbitrators appointed by FINRA.

20  This action is for a temporary restraining order and a preliminary injunction to maintain the

21  status quo pending resolution of an arbitration proceeding between Plaintiff and Defendants that

22  concurrently is being filed with FINRA Dispute Resolution. Pursuant to Rule 13804 of the FINRA

23  Code of Arbitration Procedure for Industry Disputes, member may seek a temporary injunctive order

24  from a court of competent jurisdiction. If a Court enters a temporary restraining order or other

25  injunction, an arbitration hearing on the sole issue of permanent injunctive relief will begin within 15

26  days of the court's order.

FOSTER GARVEY PC
1111 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-3296
PHONE (206) 447-4400 FAX (206) 447-9700

1

## IV.    ISSUES PRESENTED

2       Should the Court enter a temporary restraining order and preliminary injunction, enjoining

3   Defendants from using or disclosing Ameriprise's trade secrets and other information protected

4   under the terms of the Agreement and/or the UTSA and/or DTSA; ordering Defendants to return all

5   such information to Ameriprise; and enjoining Defendants from soliciting or attempting to solicit

6   those Ameriprise clients who were served by or whose names became known to Kenoyer while he

7   was in the employ of Ameriprise?

8       Should the Court require Defendants to show cause why the TRO should not continue in the

9   form of a Preliminary Injunction pending a trial on the merits?

10

## V.    ANALYSIS/LEGAL AUTHORITY

11

### A. Ameriprise is Entitled to Seek Temporary Injunctive Relief in this Court Pending Arbitration

12

13       Even where a dispute (such as this one) is ultimately to be resolved in arbitration, Ameriprise

14   is entitled to injunctive relief pending the outcome in arbitration. Many courts, including the Ninth

15   Circuit, have held that a court can grant injunctive relief in an arbitrable dispute pending arbitration,

16   as long as the prerequisites for injunctive relief are satisfied. *Toyo Tire Holdings of Ams., Inc. v.*

17   *Cont'l Tire N. Am., Inc.*, 609 F.3d 975, 980 (9th Cir. 2010) ("the congressional desire to enforce

18   arbitration agreements would frequently be frustrated if the courts were precluded from issuing

19   preliminary injunctive relief to preserve the status quo pending arbitration. . ."); *see also Nexteer*

20   *Auto. Corp. v. Korea Delphi Auto. Sys. Corp.*, No. 13-CV-15189, 2014 U.S. Dist. LEXIS 18250, at

21   *23 (E.D. Mich. Feb. 13, 2014); *Amyotrophic Lateral Sclerosis Ass'n v. Amyotrophic Lateral*

22   *Sclerosis of Mich., Inc.*, No. 05-73464, 2006 U.S. Dist. LEXIS 64323, at *11 (E.D. Mich. Sept. 8,

23   2006); *See also Aggarao v. MOL Ship Mgmt. Co., Ltd.*, 675 F.3d 355, 376 (4th Cir. 2012) ("a district

24   court has the discretion to grant a preliminary injunction to preserve the status quo pending the

25   arbitration of the parties' dispute."). Accordingly, not only is Ameriprise entitled to seek temporary

26   injunctive relief in this court pending arbitration, but this Court also has the authority to grant it.

FOSTER GARVEY PC
1111 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-3296
PHONE (206) 447-4400 FAX (206) 447-9700

**B. The Requirements for a TRO and Preliminary Injunction are Satisfied in this Case.**

Requests for temporary restraining orders are governed by the same general standards that govern the issuance of a preliminary injunction. *See New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1347 n. 2 (1977); *Los Angeles Unified Sch. Dist. v. United States Dist. Court*, 650 F.2d 1004, 1008 (9th Cir.1981) (Ferguson, J. dissenting). "Preliminary injunctive relief is available to a party that demonstrates either (1) a combination of probable success on the merits and the possibility of irreparable harm; or (2) that serious questions are raised and the balance of hardships tips in its favor." *Sammartano v. First Judicial District Court*, 303 F.3d 959, 964 (9th Cir. 2002) (quoting A & M Records, Inc. v. Napster, Inc., 239 F.3d 1004, 1013 (9th Cir. 2001)). Each of these two formulations requires an examination of both the potential merits of the asserted claims and the harm or hardships faced by the parties. The court has held that "[t]hese two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." Id. (quoting *A & M Records*, 239 F.3d at 1013, and citing *Sun Microsystems, Inc. v. Microsoft Corp.*, 188 F.3d 1115, 1119 (9th Cir.1999) ("These two alternatives represent extremes of a single continuum, rather than two separate tests.")).

As set forth below, the requirements for a TRO and preliminary injunction are satisfied in this case and, therefore, Ameriprise should be granted an order enjoining and restraining Kenoyer and LPL, and any person or entity acting in concert with them, from misappropriating Ameriprise's trade secrets and other confidential information in violation of the Agreement, ordering the return of all such trade secrets and other confidential information to Ameriprise, and enjoining Kenoyer and LPL from soliciting Ameriprise clients who were served by or whose names became known to Kenoyer and LPL while he was employed by Ameriprise.

**C. Ameriprise is Likely to Succeed on the Merits**

**1. The Agreement is Enforceable, and Kenoyer's Conduct Violates the Agreement.**

Under Washington law, a restrictive covenant is enforceable if reasonable. *Perry v. Moran*, 109 Wn.2d 691, 698, 748 P.2d 224 (1987); *Knight, Vale & Gregory v. McDaniel*, 37 Wn. App. 366,

FOSTER GARVEY PC
1111 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-3296
PHONE (206) 447-4400 FAX (206) 447-9700

1  369, 690 P.2d 448 (1984). Whether a covenant is reasonable involves a consideration of three

2  factors: (1) whether restraint is necessary for the protection of the business or goodwill of the

3  employer, (2) whether it imposes upon the employee any greater restraint than is reasonably

4  necessary to secure the employer's business and goodwill, and (3) whether the degree of injury to

5  the public is such loss of the service and skill of the employee as to warrant nonenforcement of the

6  covenant. *Perry,* 109 Wn.2d at 698 (quoting *Knight,* 37 Wn. App. at 368). In *Perry,* the Court upheld

7  a non-competition agreement that prohibited not only the solicitation of the former employer's

8  clients, but also the provision of services to those clients, for a period of five years following the

9  termination of employment. *Id.* at 700. In finding the agreement to be "proper, reasonable, and

10  enforceable," the court stated:

11  > A covenant prohibiting the former employee from providing accounting services to the
12  > firm's clients for a reasonable time is a fair means of protecting that client base. A bargain by
      > an employee not to compete with the employer during the terms of employment or thereafter
13  > for a reasonable time and within a reasonable territory, as may be necessary for the
      > protection of the interests of the employer without imposing undue hardship on the
14  > employee, is valid.

15  *Id.* (citing Restatement of Contracts § 516(f) (1932)).

16        Similarly, in *Knight,* the Washington Court of Appeals upheld a three-year non-solicitation

17  and non-competition agreement to the extent that it prohibited the departing employees from

18  performing accounting services for those clients of the former employer with whom the employees

19  had come into contact as a direct result of their employment. *Knight,* 37 Wn. App. at 370. In finding

20  the covenant "reasonable and lawful," the court noted that the necessity of the covenant to protect

21  the employer's business was enhanced in the sphere of public accounting, which, like the sphere of

22  financial consulting, involves close, familiar client relationships that allow a departing employee to

23  be exceptionally competitive with the firm should he or she choose to leave and offer the same

24  services elsewhere. *Id.* The *Knight* court further found that the covenant was not unduly restrictive

25  because, among other things, the departing employees were free to compete for clients served by

26  anyone other than their former employer. *Id.*

MOTION FOR TEMPORARY RESTRAINING ORDER AND
ORDER TO SHOW CAUSE – 13

FOSTER GARVEY PC
1111 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-3296
PHONE (206) 447-4400 FAX (206) 447-9700

Here, the restrictive covenants at issue are far narrower than those upheld in *Perry* and *Knight.* Here, the restrictive covenants consist of agreements not to remove confidential information of Ameriprise or use such information for any purpose other than conducting business for Ameriprise; and to refrain from soliciting Ameriprise's clients Kenoyer learned of while he was employed at Ameriprise. All of these restrictions are reasonable under Washington law. The restraint is clearly necessary to protect Ameriprise's business and goodwill; the restrictions do not impose on Kenoyer any greater restraint than is reasonable necessary and, in fact, do not prohibit Kenoyer or LPL from competing head-to-head for new clients at any time and in any location or from doing business with Ameriprise clients, so long as those clients are not "solicited" by Kenoyer and so long as no trade secret or other confidential information is used or disclosed in the process; and there is no injury to the public for the same reasons. Thus, the Court should find as a matter of law that the restrictive covenants contained in the Agreement are reasonable under Washington law.

As discussed herein, the evidence is overwhelming and undeniable that Kenoyer: (i) pre-solicited clients; and (ii) misappropriated substantial Ameriprise confidential client information, presumably with the intent to disclose to LPL and solicit at LPL. These actions violate the clear restrictions on Kenoyer's post-employment activities, which are well within the limits of what Washington courts have found to be reasonable. As Plaintiff is likely to show in arbitration that it has a clear legal and equitable right to enforce the restrictive covenants Kenoyer agreed to, Kenoyer should be enjoined from continuing to violate his obligations under the Agreement.

Because these breaches have already occurred and are established by the evidence, Ameriprise has shown a likelihood of prevailing on the merits of its breach of contract claim. Immediate injunctive relief is necessary in this case to prevent further breaches of the Agreement and enforce Ameriprise's contractual rights.

Foster Garvey PC
1111 Third Avenue, Suite 3000
Seattle, Washington 98101-3296
Phone (206) 447-4400 Fax (206) 447-9700

**2. Defendants' Conduct Violates the Washington Uniform Trade Secrets Act ("UTSA") and the Defend Trade Secrets Act ("DTSA").**

The Washington Uniform Trade Secrets Act ("UTSA") authorizes the issuance of injunctive relief for an actual or threatened misappropriation of a trade secret. RCW 19.108.020(1). Additionally, in appropriate circumstances, a court may enter an order compelling affirmative acts to protect a trade secret. RCW 19.108.020(3). Generally, taking an employer's confidential customer list and client information without permission is a trade secret misappropriation in violation of the UTSA. *Thola v. Henschell*, 140 Wn. App. 70, 79, 164 P.3d 524, 528 (2007) (citing *Ed Nowogroski Ins., Inc. v. Rucker*, 137 Wn.2d 427, 971 P.2d 936 (1999)). A customer list and client information are a protected trade secret under the UTSA if (1) they are a compilation of information (2) that is valuable because unknown to others, and (3) the owner has made "reasonable attempts" to keep the information secret. *Ed Nowogroski Ins*., 137 Wn.2d at 442. A compilation of information can constitute a trade secret even if some elements of the compilation are in the public domain. *Boeing Co. v. Sierracin Corp*., 108 Wn.2d 38, 50, 738 P.2d 665 (1987). In *Nowogroski*, the trial court found that insurance information, including insurance summaries, customer lists and other documents containing names, expiration dates, coverage information and related information produced by the agency or by the insurance company and kept by the agency constituted trade secrets under the UTSA. 137 Wn.2d at 432, 439.

"Misappropriation" of a trade secret can occur in a number of ways, including the use or disclosure of a trade secret by someone who knows or has reason to know that his or her knowledge of the secret was "acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use." RCW 19.108.010(2)(b)(ii)(B). An employee's duty not to divulge or use secret information continues after the termination of his or her employment, even in the absence of a restrictive covenant. *Ed Nowogroski Ins*., 137 Wn.2d at 437. Further, the Washington Supreme Court has determined that misappropriation applies not only to physical documents, but also to trade secret information retained in the employee's memory. Id. at 444- 45. Thus, the UTSA does not require a

MOTION FOR TEMPORARY RESTRAINING ORDER AND
ORDER TO SHOW CAUSE – 15

FOSTER GARVEY PC
1111 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-3296
PHONE (206) 447-4400 FAX (206) 447-9700

1    plaintiff to prove actual theft or conversion of physical documents embodying the trade secret

2    information to prove misappropriation. Id. at 445.

3        In this case, the records that Kenoyer removed from Ameriprise are a "compilation" of

4    information that includes the names of actual Ameriprise customers, along with detailed contact

5    information pertaining to those customers. *See* Call Decl. at ¶15. This information enables

6    Ameriprise to serve its customers effectively, and the information is not readily available to the

7    general public or Ameriprise's competitors from a telephone book, library, professional directory or

8    other publicly available resource. Although competitors could independently assemble the bits and

9    pieces of the information compiled by Ameriprise, competitors do not have access to and cannot

10   independently obtain, without a substantial expenditure of time, money and effort, the totality of the

11   information. Indeed, without contacting each customer individually, Ameriprise's competitors could

12   not acquire access to information contained in Ameriprise's records. Based on these facts, it is

13   apparent that the information taken and used by Defendants constitutes a trade secret that clearly

14   derives independent economic value from not being generally known to the public or other persons

15   who can obtain economic value from its disclosure or use.

16       As detailed in the Call Declaration, Ameriprise employs reasonable efforts to maintain the

17   confidentiality of its records. Specifically, access to the records is restricted to those employees

18   whose jobs require them to refer to this information, duplication of the records is prohibited, and

19   there are constant reminders about the confidential nature of the information contained in the

20   records. Moreover, Ameriprise employees, including Kenoyer, are required to sign a confidentiality

21   and non-solicitation agreements with Ameriprise—the Franchise Agreement—whereby the

22   employees agree to not utilize or exploit Ameriprise's customer records. For these reasons,

23   numerous decisions have accorded trade secret status to customer information maintained by

24   brokerage firms.

25       Kenoyer's removal and Defendants' retention and use of Ameriprise's trade secrets for the

26   purpose of soliciting Ameriprise clients constitutes "misappropriation" of Ameriprise's trade secrets

1   and violates the UTSA because Defendants knew or had reason to know that his knowledge of the

2   secrets was "acquired under circumstances giving rise to a duty to maintain its secrecy or limit its

3   use," as demonstrated by the fact that he signed the Franchise Agreement as a condition of

4   employment. Under the UTSA, actual or threatened misappropriation of a trade secret may be

5   enjoined, RCW 19.108.020(1), even without a finding of irreparable harm. RCW 19.108.020(1); CR

6   65(d*); Boeing Co. v. Sierracin Corp.*, 108 Wn.2d 38, 42–43, 738 P.2d 665 (1987).

7       "The elements of a DTSA and UTSA claim are substantially similar." *Traverse Therapy*

8   *Servs., PLLC v. Sadler-Bridges Wellness Grp., PLLC*, No. 2:23-CV-1239, 2024 WL 381180, at *3

9   (W.D. Wash. Feb. 1, 2024). Thus, Kenoyer's actions also violate the Defend Trade Secrets Act of

10  2016, 18 U.S.C. § 1836 *et seq*. ("DTSA"). By breaching his duty of confidentiality to otherwise

11  maintain the secrecy of Ameriprise's trade secrets, Kenoyer acquired Ameriprise's trade secrets by

12  "improper means," as defined in the DTSA.

13      Courts in the securities industry considering circumstances similar to those here have

14  repeatedly held in favor of entering injunctive relief to protect the misappropriation of confidential

15  information or prohibit the continued solicitation of the former employer's clients prior to an

16  adjudication on the merits. *See, e.g., Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Salvano*, 999

17  F.2d 211 (7th Cir. 1993); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dutton*, 844 F.2d 72 (10th

18  Cir. 1986); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley*, 756 F.2d 1048 (4th Cir. 1985);

19  *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Stidham*, 658 F. 2d 1098 (5th Cir. 1981). Because so

20  many courts enforce such restrictions through temporary injunctive relief, Ameriprise's entitlement

21  to such relief at this stage cannot be disputed.

22      Thus, under the facts of this case, the Court should enter a temporary restraining order and

23  preliminary injunction restraining Defendants from using or disclosing Ameriprise's trade secrets

24  and ordering Kenoyer to return all such trade secrets to Ameriprise.

25      To be clear, Plaintiff is not seeking to enforce any type of non-compete or non-accept of

26  clients against Kenoyer that would be prohibited under RCW 49.62.010. Plaintiff is merely seeking

MOTION FOR TEMPORARY RESTRAINING ORDER AND
ORDER TO SHOW CAUSE – 17

FOSTER GARVEY PC
1111 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-3296
PHONE (206) 447-4400 FAX (206) 447-9700

to enforce the non-solicitation and non-disclosure covenants and to stop Defendants from soliciting Ameriprise clients using Ameriprise's confidential and proprietary information. Ameriprise is also seeking the return of any and all improperly taken confidential and proprietary information of Ameriprise.

### 3. Kenoyer Violated his Common Law Duty of Loyalty to Ameriprise

During the time that Kenoyer was an Ameriprise employee, he owed a duty of loyalty that required him to act only in Ameriprise's best interests. *Moon v. Phipps,* 67 Wn.2d 948, 954-55, 411 P.2d 157 (1966). An employee is not entitled to solicit clients for rival business or in direct competition with his or her employer's business during employment, even absent an employment contract imposing a contractual duty of non-competition. *Kieburtz & Assocs., Inc. v. Rehn*, 68 Wn. App. 260, 265, 842 P.2d 985, 988 (1992). Here, Kenoyer breached his duty of loyalty to Ameriprise when he misappropriated Ameriprise's records, with the intent to solicit clients to transfer their accounts from Ameriprise to LPL. Additionally, at a minimum, Kenoyer's conduct in taking confidential Ameriprise client files and client contact information, demonstrate an egregious breach of his duty of loyalty. On this evidence, Ameriprise has made a sufficient showing to establish a likelihood of success on this claim.

### D. Ameriprise is Likely to Suffer Irreparable Injury if Injunctive Relief is Not Granted, and There is no Adequate Remedy at Law.

Ameriprise will suffer immediate irreparable harm if an injunction does not issue. Numerous courts have determined that a brokerage firm has no adequate remedy at law in the absence of an injunction when departing registered representatives have engaged in conduct substantially the same as that in which Defendants are engaging. Indeed, *in Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Salvano*, 999 F.2d 211 (7th Cir. 1993), the Seventh Circuit affirmed the issuance of a TRO and preliminary injunctive relief under closely analogous circumstances when it held that "the available evidence—indicating that [defendants] took various documents and information pertaining to Merrill Lynch's clients and used that information to solicit Merrill Lynch customers—sufficiently supports

1   the court's determinations regarding irreparable harm and the inadequacy of Merrill Lynch's legal

2   remedy." 999 F.2d at 215. Likewise, in *Merrill Lynch, Pierce, Fenner& Smith, Inc. v. Bradley*, 756

3   F.2d 1048, 1053-1054 (4th Cir. 1985), the Fourth Circuit held that immediate injunctive relief must

4   be rendered "within a few days" in order to negate the otherwise irreparable harm caused by conduct

5   such as that engaged in by Defendant.

6   　　　All of the considerations that supported the determination of the *Salvano and Bradley* courts

7   concerning irreparable harm and the lack of an adequate remedy at law are equally present in this

8   case. First, it will be impossible to determine Ameriprise's damages with any reasonable degree of

9   certainty. This consideration has been recognized in numerous cases involving analogous

10  circumstances as a sufficient basis for injunctive relief. In *Merrill Lynch, Pierce, Fenner & Smith,*

11  *Inc. v. Stidham*, 658 F.2d 1098 (5th Cir. 1981), the Fifth Circuit held that the breach by individual

12  registered representatives of their employment agreements with a securities brokerage firm, and their

13  misappropriation of the firm's trade secrets, caused irreparable harm to the firm. In making this

14  determination, the *Stidham* court emphasized:

15  　　　[T]he injury here is such that damages could not adequately compensate. Were
16  　　　defendants permitted by the law to exploit the clientele of their former employers,
     　　　every investment that reasonably flowed from the exploitation should be included
17  　　　in the damages award. How such a figure could be arrived at escapes us.

18  658 F.2d at 1102.

19  　　　Here, it would be difficult to determine what Ameriprise's loss in profits and new business

20  will be if the Agreement is not enforced. No remedy at law will make Ameriprise whole. *See Merrill*

21  *Lynch, Pierce, Fenner & Smith, Inc. v. Bradley*, 756 F.2d at 1055; *Merrill Lynch, Pierce, Fenner &*

22  *Smith, Inc. v. Grall*, 836 F. Supp. 428, 433 (W.D. Mich. 1993). It is impossible to determine at this

23  time the number of Ameriprise clients that Kenoyer will (if not restrained) be able to solicit to

24  transfer their accounts to LPL. In view of the ever-changing conditions in the securities markets, it

25  cannot be determined with any degree of certainty the amount of the commissions that would be

26  generated from particular customer accounts not only during the upcoming year, but also for the

MOTION FOR TEMPORARY RESTRAINING ORDER AND
ORDER TO SHOW CAUSE – 19

Foster Garvey PC
1111 Third Avenue, Suite 3000
Seattle, Washington 98101-3296
Phone (206) 447-4400 Fax (206) 447-9700

1    indeterminate amount of time in the future. Thus, the amount of commissions that Ameriprise would

2    have received (but for Kenoyer's removal of client records and information and the solicitation of

3    clients in violation of the Agreement) from each account is not subject to ready determination. In

4    view of the difficulties inherent in attempting to calculate the financial loss that will be caused if

5    Kenoyer's wrongful conduct is not restrained Ameriprise is subjected to irreparable harm and its

6    remedy at law is inadequate.

7         Irreparable injury is also an actual and concrete harm, or the imminent threat of an actual or

8    concrete harm. *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1200 (9th

9    Cir. 1980). Kenoyer cannot dispute that if he is permitted to violate his restrictive covenants and

10   fiduciary duties, as well as Chapter 19.108 RCW, Plaintiff are likely to suffer actual and substantial

11   injury. Actual injury is occurring at this very moment, as Kenoyer has already improperly solicited

12   and convinced multiple clients to transfer their accounts to him and LPL. *See* Kinney Decl. ¶ 15;

13   Call Decl. ¶ 20. The establishment, maintenance and retention of clients is absolutely vital to

14   Plaintiff's business. Ameriprise has spent many years, as well as a significant amount of money and

15   time, building goodwill and developing his reputation and customer base. Plaintiff has undertaken

16   significant efforts to protect the personal information of their clients and prospective clients**.** By

17   improperly soliciting Ameriprise's clients, Kenoyer has tarnished the trust and good will Ameriprise

18   has expended a great amount of time and money to attain. In sum, Plaintiff can show a likelihood of

19   actual and substantial injury in the absence of injunctive relief.

20        Additionally, Kenoyer's employment with Ameriprise and access to substantial additional

21   clientele was conditioned upon his assurances that he would not disclose confidential information or

22   solicit Plaintiff's clients, as such activity would irreparably harm reputation, goodwill, and the

23   business of Plaintiff. In short, Plaintiff will suffer actual and substantial injury, as well as irreparable

24   harm, if Kenoyer is not enjoined from violating his restrictive covenants and fiduciary duties and

25   from engaging in misappropriation of Ameriprise's trade secrets. As all three prongs for injunctive

26   relief have been shown, the Court should grant Plaintiff' motion for a temporary restraining order.

MOTION FOR TEMPORARY RESTRAINING ORDER AND
ORDER TO SHOW CAUSE – 20

FOSTER GARVEY PC
1111 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-3296
PHONE (206) 447-4400 FAX (206) 447-9700

1    **E.  Kenoyer Cannot Rely on the Protocol to Avoid Injunctive Relief in this Matter.**

2    Defendants may contend that injunctive relief should not issue against them because both

3    Ameriprise and LPL are signatories to the industry wide Protocol for Broker Recruiting ("Protocol"),

4    which provides a procedure by which a financial advisor can move from one Protocol firm to

5    another Protocol firm without incurring civil liability for taking certain limited client information

6    and soliciting those clients after associating with the new firm. In order to obtain the benefits of the

7    Protocol (avoidance of liability), the departing representative must follow the procedures set forth in

8    the Protocol, which include taking only very limited client information upon departure from the

9    former firm (limited to client name, address, phone number, email address, and account title of the

10   clients the representative served while at the firm ("the Client Information")), and providing the

11   former firm a copy of the Client Information the representative is taking, which copy should also

12   include account numbers (even though the departing representative cannot take those account

13   numbers to the new firm). Here, Defendants retained substantial information beyond that which is

14   permissible pursuant to the Protocol. As a result, Defendants cannot invoke the protections of the

15   Protocol. Confidential Ameriprise client contact information also was removed from Ameriprise. In

16   short, Defendants did not come close to complying with the Protocol and have blatantly disregarded

17   its requirements and therefore does not qualify for its protections.

18   **F.  Weighing of the Equities also Decidedly Favors Entry of Injunctive Relief.**

19   When considering whether to grant injunctive relief, courts also balance the relative interests

20   of the parties and, where appropriate, the public interest. *Nw. Gas Ass'n v. Wash. Util. & Transp.*

21   *Comm'n*, 141 Wn. App. 98, 122, 168 P.3d 443, 455 (2007). The equities here weigh heavily in favor

22   of preserving the status quo. *Federal Way Family Physicians, Inc. v. Tacoma Stands Up for Life*, 106

23   Wn.2d 261, 265 (1981) (in deciding whether to grant injunctive relief, a court should attempt to

24   preserve the status quo). Plaintiff justifiably relied on Kenoyer's assent to the non-solicitation and

25   non-disclosure covenants in the Agreement in making substantial investment in Kenoyer's training

26

MOTION FOR TEMPORARY RESTRAINING ORDER AND
ORDER TO SHOW CAUSE – 21

FOSTER GARVEY PC
1111 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-3296
PHONE (206) 447-4400 FAX (206) 447-9700

1  and allowing him access to customer information. As a matter of equity, Kenoyer should not now be

2  permitted to renege on those important and reasonably negotiated terms.

3      Moreover, the injunction sought by Plaintiff simply holds Kenoyer to the terms of the

4  contract he willingly agreed to. That he wishes to benefit personally from Plaintiff's work and

5  significant investment in building client lists and relationships is no reason to excuse Kenoyer from

6  his contractual obligations. *See Minder v. Rowley*, 35 Wn.2d 92, 95, 211 P.2d 170 (1949). The

7  Franchise Agreement specifically permits Kenoyer to find employment with a competitor to

8  Ameriprise:

9      Nothing in this Agreement will prevent Independent Advisor from engaging in a
       competitive business consistent with the covenants in this Section 19, including
10     serving as a consultant or financial advisor affiliated with another firm, after this
       agreement expires or is terminated.

11

12  *See* Call Decl., Exhibit A.

13      Neither Kenoyer nor the public has any legitimate interest in allowing Kenoyer to violate his

14  covenants with Ameriprise and his fiduciary duties thereto. Preventing Defendants from continuing

15  to retain, use, and disclose Ameriprise's confidential information and trade secrets does not harm

16  Defendants at all—they are not entitled to such information in the first place. An order enjoining the

17  individual Defendants from using Ameriprise confidential client information does not put any more

18  burden on them than do the applicable contracts, statutes, and common law. The balance of the

19  equities weighs in favor of Plaintiff, and the Court should grant Plaintiff equitable relief and enjoin

20  Kenoyer from ignoring Plaintiff's contractual rights along with LPL's continued profiteering from

21  same. The Court should also enter a mandatory injunction requiring Defendants to return Plaintiff's

22  confidential and proprietary information to restore the status quo ante.

23      **G. The Court Should Continue the TRO as a Preliminary Injunction.**

24      The Court should also require Defendants to show cause as to why a preliminary injunction

25  should not continue until a FINRA arbitration hearing is held within 15 days. Both a temporary

26  restraining order and preliminary injunction serve the general goal of preserving the status quo until

MOTION FOR TEMPORARY RESTRAINING ORDER AND
ORDER TO SHOW CAUSE – 22

FOSTER GARVEY PC
1111 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-3296
PHONE (206) 447-4400 FAX (206) 447-9700

1    there can be an adjudication of the issues on the merits. The same standards apply for both, and

2    therefore, the TRO should continue as a preliminary injunction pending FINRA arbitration.

3                              **VI.    <u>CONCLUSION</u>**

4            Based on the foregoing, the Court should enter a TRO immediately, enjoining Defendants

5    from: (i) retaining possession of, using, or disclosing any of Plaintiff's confidential and proprietary

6    information or trade secrets; (ii) contacting Plaintiff's clients; and (iii) soliciting Plaintiff's clients.

7    The Court should also order Defendants to show cause why the injunction granted in the TRO

8    should not continue as part of a preliminary injunction pending an arbitration on the merits.

MOTION FOR TEMPORARY RESTRAINING ORDER AND
ORDER TO SHOW CAUSE – 23

FOSTER GARVEY PC
1111 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-3296
PHONE (206) 447-4400 FAX (206) 447-9700

1     DATED this 14th day of October, 2024.

2                                    *I certify that this memorandum contains 7,511 words, in*
3                                    *compliance with the Local Civil Rules*

4                                    FOSTER GARVEY PC

5                                    By: *s/ Matthew Kelly*
6                                        Diana S. Shukis, WSBA #29716
                                         Matthew Kelly, WSBA #48050
7                                        FOSTER GARVEY PC
                                         1111 Third Avenue, Suite 3000
8                                        Seattle, Washington 98101
                                         (206) 447-4400
9                                        diana.shukis@foster.com
10                                       matthew.kelly@foster.com

11
                                     SHUMAKER, LOOP & KENDRICK, LLP
12
                                     By:  s/ Brandon M. Taaffe
13
                                         Michael S. Taaffe, Esq., Fla. Bar No. 490318
14                                       mtaaffe@shumaker.com
                                         (*Pro Hac Vice* Admission forthcoming)
15                                       Brandon M. Taaffe, Esq., Fla. Bar No. 118932
                                         btaaffe@shumaker.com
16                                       (*Pro Hac Vice* Admission forthcoming)
                                         James E. Fanto, Esq., Fla. Bar No. 1004144
17                                       jfanto@shumaker.com
                                         (*Pro Hac Vice* Admission forthcoming)
18                                       240 South Pineapple Avenue
                                         Post Office Box 49948
19                                       Sarasota, Florida 34230-6948
                                         (941) 366-6660
20                                       (941) 366-3999 (fax)

21
                                     Counsel for Plaintiff AMERIPRISE FINANCIAL
22                                   SERVICES, LLC

23

24

25

26

FOSTER GARVEY PC
1111 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-3296
PHONE (206) 447-4400 FAX (206) 447-9700

## CERTIFICATE OF SERVICE

I certify that on October 14, 2024, I electronically filed the foregoing document with the Clerk of the Court via CM/ECF which will notify all parties in this matter who are registered with the Court's CM/ECF filing system of such filing. All other parties (if any) shall be served in accordance with the Federal Rules of Civil Procedure.

DATED this 14th day of October, 2024.

*s/ Jeanne Perrin*
Jeanne Perrin, Legal Practice Assistant
Foster Garvey PC
1111 Third Avenue Suite, 3000
Seattle, Washington 98101
jeanne.perrin@foster.com

FOSTER GARVEY PC
1111 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-3296
PHONE (206) 447-4400 FAX (206) 447-9700