**Declaration of James Reilly**

I, James Reilly, declare:

1. My name is James Reilly. I am competent to make this Declaration. The facts set forth below regarding my qualifications and the work I have performed are all within my personal knowledge and are true and correct. The historical information and industry observations I provide below are true and correct based on my knowledge and experience. The opinions expressed below are my own opinions that I believe to be valid and to be fully supported by the materials and rationales I cite.

2. Counsel for LPL Financial retained me as an expert on the broker-dealer industry and specifically the supervisory obligations of a broker-dealer.

**Qualifications**

3. I have worked in the broker-dealer industry since 1989. I previously held FINRA Series 3, 7, 8, 14, 24, 63, and 65 Licenses.

4. Throughout my over 30-year career, I have served in various regulatory, compliance and executive capacities at both broker-dealers and the industry regulator.

5. I began my career in 1989 as a Special Investigator for the National Association of Securities Dealers, the predecessor entity to FINRA—the principal industry regulator for broker dealers.

6. Following that experience, I have held various positions overseeing the compliance functions of broker-dealers. Among other positions held, from 2000 to 2006 I served as the Managing Director for Global Equities Compliance at Goldman, Sachs & Co., where I headed a global team of over 100 compliance professionals and was responsible for the implementation and oversight of supervision technology platforms, among other things.

7. From 2006 to 2008, I served as Senior Vice President and Chief Compliance Officer at TIAA-CREF, where I headed the compliance function of the broker-dealer and was responsible for the creation and implementation of various supervision technologies and processes.

8.  From 2010 to 2016, I served as Managing Director and Chief Compliance Officer for TD Ameritrade, Inc. I led the entire compliance function for the broker-dealer, which included design and review of all policies, procedures, and training related to the broker-dealer's supervisory obligations.

9.  I have extensive experience with, and knowledge of, broker-dealer supervisory obligations. I was a member of the SIFMA Chief Compliance Officer Committee from 2011 to 2016. I have worked actively as a consultant and expert witness since late 2018, and through this work I remain current on industry practices and norms.

10. A copy of my curriculum vitae is attached hereto as Exhibit A.

**A Broker-Dealer's Supervisory Obligations**

11. Broker-dealers' principal regulator is FINRA, a private not-for-profit membership organization that is responsible for supervising its member firms (known as a "self-regulatory organization"). FINRA is empowered by federal law, with the oversight of the Securities and Exchange Commission, to promulgate rules governing the activity of its member firms and to investigate and bring enforcement actions for violations of those rules.

12. FINRA Rule 3110 ("Supervision") sets forth the key elements of a broker-dealer's supervisory obligations. A true and correct copy of Rule 3110 is attached hereto as Exhibit B.

13. As set forth in Rule 3110, a broker-dealer is required to "establish and maintain a system to supervise the activities of each associated person that is reasonably designed to achieve compliance with applicable securities laws and regulations, and with applicable FINRA rules." The Rule specifically requires the broker-dealer to: (1) establish and maintain written procedures; (2) designate supervisory personnel, and take reasonable efforts to ensure they are qualified; (3) assign registered representatives to these supervisory personnel; and (4) have each registered representative and registered principal undertake a compliance meeting or interview at least annually.

14. As the Rule explicitly states, FINRA requires and expects only that the

broker-dealer's supervisory system be *reasonably* designed to achieve compliance with applicable securities laws, regulations, and FINRA rules. FINRA gives firms significant latitude to design and implement appropriate supervisory systems that are reasonable based on the nature of the firm's business, the manner in which it operates, its size, and other relevant considerations.

15. The purpose of a supervision system under Rule 3110 is ultimately to reasonably ensure that the securities laws, regulations, and rules are not being violated. Supervision is ultimately about protecting the customer from violations of the securities laws. Supervision under Rule 3110 is not meant to—and cannot—supervise whether every person associated with the broker-dealer is in compliance with every legal obligation that he or she may have.

16. In my experience, a broker-dealer's supervision of its registered representatives does not ordinarily—and, in fact, would only under exceptional circumstances--include forensic imaging or other review of their personal devices. Such imaging and review is intrusive, disruptive of an advisor's ability to conduct their business (and personal affairs), and creates significant privacy concerns.

17. Accordingly, broker-dealers only rarely request and review registered representatives' personal devices, where they have a clear and compelling reason to believe that such review would uncover a violation of the securities laws, regulations, or rules.

**Supervisory and Background Check Obligations in Connection with Advisor Transitions**

18. Financial advisors (known as "registered representatives" in the industry) often move between broker-dealers throughout their careers.

19. When a financial advisor is registered with a broker-dealer, *only* that broker-dealer has a supervisory obligation over her. Even if another broker-dealer is recruiting the advisor, that second firm is not responsible for supervising the advisor unless and until she becomes registered with it. Indeed, that firm *cannot* supervise the advisor while she is registered with another firm: it has no visibility into the advisor's conduct.

20.     In other words, a broker-dealer's supervisory obligations over an advisor commence when the advisor registers their licenses with it.

21.     FINRA Rules set forth specifically what a broker-dealer's due diligence obligations are with respect to advisor recruits. Those obligations are set forth in FINRA Rule 3110(e).

22.     FINRA Rule 3110(e) sets forth a broker-dealer's obligation to conduct a background investigation on "applicants for registration"—that is, financial advisors (or prospective advisors) who will become registered representatives of the firm.

23.     Rule 3110(e) provides that the firm "shall ascertain by investigation the good character, business reputation, qualifications and experience of an applicant[.]"

24.     It further provides that "if the applicant previously has been registered with FINRA or another self-regulatory organization, the member [firm] shall review a copy of the applicant's most recent Form U5[.]" The Form U5 is the form that is filed by a firm when a registered representative ceases to be registered with it. It sets forth the reason for the representative's departure.

25.     The purpose of the background check procedure set forth in Rule 3110(e) is primarily to determine whether the advisor recruit may pose a risk to customers in the management of their investments.

26.     In 2015, FINRA promulgated Regulatory Notice 15-05 further detailing the requirements set forth in Rule 3110(e). It describes the requirement to conduct a background investigation by reviewing any previously filed Form U5 for the advisor as well as reasonably available public records to confirm the accuracy of information contained in the applicant's Form U4 (the registration form for registered representatives).

27.     FINRA Rules, including Rule 3110(e), do not require a member firm to review an advisor's contract with their prior firm. Indeed, many firms take the position that their contracts are confidential—accordingly, review of the contract by another firm could give rise to breach of confidentiality claims.

28.     FINRA Rules do not require a member firm to forensically review an

1  advisor's personal devices in connection with their background investigation of the advisor
2  pursuant to Rule 3110(e).

3     29.     Moreover, requesting forensic review of an advisor's personal devices in
4  connection with their onboarding would be a major violation of industry norms and
5  standards. I am not aware of any firm ever forensically reviewing an advisor recruit's
6  personal devices in connection with their onboarding.

**FINRA, Not Other Broker-Dealers, Investigates and Enforces Its Rules**

     30.     FINRA is the principal regulator of its member firms. FINRA is empowered, through a series of rules codified at Rules 8100-8330, to investigate its member firms for potential violations of its rules.

     31.     Only FINRA can bring an investigation and enforcement action related to a violation of its rules. Member firms have no authority to sue, or even allege, another member firm regarding an alleged rule violation.

     32.     Accordingly, only FINRA is empowered to investigate and determine whether a firm has violated Rule 3110—or any other FINRA rule.

     33.     If FINRA determines a member firm has violated a rule (including Rule 3110), it can and does bring an enforcement action against the member firm.

**The Broker Protocol Does Not Impose an Additional Due Diligence Requirement**

     34.     From my prior roles and experience, I am familiar with the manner in which the Protocol for Broker Recruiting ("Broker Protocol" or "Protocol") operates in the industry.

     35.     At its heart, the Broker Protocol is a litigation forbearance agreement. Signatories to the Broker Protocol, like Ameriprise and LPL, agree that they will not sue each other or a departing advisor if she follows the departure procedure in the Protocol.

     36.     The Broker Protocol does not require or create an affirmative obligation for a firm to conduct due diligence into whether an advisor transitioning to it has complied with the Protocol.

     37.     Indeed, such due diligence would be limited and likely ineffective given that

the "receiving" firm has no visibility or insight into the manner of the advisor's departure from their prior firm.

38. All that a receiving firm can reasonably confirm is whether it receives only Protocol Information from a transitioning advisor or whether it receives information beyond that set forth in the Protocol. In the latter case, if the receiving firm understood the advisor to be departing under the Broker Protocol, the industry norm and standard would be to reach out to the prior firm to discuss and resolve the issue.

**The SEC's Texting Sweep Did Not Establish an Obligation to Forensically Review Advisors' Devices—Or Even Provide Authority for Doing So**

39. In its Motion for an Order to Show Cause, Ameriprise cites a settlement entered into between LPL and the SEC and argues it demonstrates "LPL clearly has the ability to gather and review its registered representatives' personal devices," arguing that it would thus "seem relatively basic that it would review Mr. Kenoyer's devices upon order of a Federal Court."

40. This assertion is wrong.

41. Beginning in 2022, the SEC began investigating and entering into settlement agreements with dozens of broker-dealers related to violations of recordkeeping provisions in the federal securities laws. Specifically, the SEC found that employees of the broker-dealers were engaging in business communications on personal devices and failing to preserve records of those communications, as required by Rule 17a-4 of the Exchange Act of 1934. This investigation was colloquially known as the "off-channel communications" or "texting" "sweep."

42. On August 14, 2024, *both* Ameriprise and LPL—along with two dozen other broker-dealers—entered into *identical* settlements related to this investigation, with *both* firms agreeing to pay a $50 million penalty.

43. In the materially identical Orders entered against Ameriprise and LPL, the SEC found that both broker-dealers failed to keep records of business communications that were sent through personal devices.

44.     In neither Order did the SEC state that firms were required, or even expected, to forensically review financial advisors' personal devices—either to monitor for business communications subject to recordkeeping requirements, or for any other reason.

45.     To the extent Ameriprise asserts that the SEC's Orders against Ameriprise and LPL (among many other broker-dealers) established that firms can, or should, regularly request advisors' personal devices and forensically review them, that assertion is wrong.

46.     Even after the SEC's "sweep," to my knowledge, no firm in the industry collects and reviews advisors' personal devices absent extremely good cause to believe that doing so would uncover a violation of the securities laws.  Again, that is because doing so is an extreme action that necessarily violates an advisor's right to privacy.

47.     Instead, firms ask registered representatives to confirm their compliance with recordkeeping rules and that they are not engaged in business communications on personal devices.

48.     The suggestion that it would be "relatively basic" for an independent broker-dealer to demand that an independent registered representative turn over his personal devices for imaging and review is contrary to all industry norms and expectations.

**Mr. Tilkin's Declaration is Flawed**

49.     In his Declaration, Ameriprise's expert, David Tilkin, makes a number of unsupported assertions, such as "As a registered representative, Defendant Kenoyer is supervised by Defendant LPL who is required under FINRA Rules such as Rule 3110(c) to periodically review the offices and computer systems of Mr. Kenoyer."[1]  First, the section referenced concerns the obligation of a broker/dealer to perform periodic branch inspections.  In the case of Mr, Kenoyer, this would be performed no less frequently than every three years.  Second, the rule never once mentions the duty to review computer systems.  Indeed, you will not find that phrase in the entirety of Rule 3110.

---

[1] Tilkin Declaration at 7.

50. Mr. Tilkin goes on to assert that "In that LPL is solely and singly responsible for advisor supervision and adherence to industry rules and regulations, LPL should have presented the details and nuances of the Order to Mr. Kenoyer, explained them in operational language, monitored compliance, and memorialized the entire process."[2] In this statement, Mr. Tilkin ignores that individual registered representatives, such as Kenoyer, have their own independent obligations to adhere to FINRA rules and regulations, regardless of which firm they are registered with. He also seems to ignore the fact that Kenoyer received independent legal counsel regarding his transfer, and continues to be represented by separate counsel in this proceeding, and that LPL was cognizant that he was independently advised by counsel.

51. Finally, Mr. Tilkin suggests "If LPL simply asked Mr. Kenoyer whether he complied without executing oversite (sic) and supervision, and monitoring compliance, it would be derelict in its supervisory duties."[3] This ignores that there are many aspects of compliance with FINRA rules in which broker-dealers reasonably rely on their advisors' representations (including things like Outside Business Activities (under FINRA Rule 3270) and Private Securities Transactions (under FINRA Rule 3280)).

**Conclusion**

52. Here, I understand that LPL sought and obtained confirmation from Mr. Kenoyer that he was complying with the Court's Order regarding the deletion and return of any Ameriprise customer information.

53. In my opinion, that is exactly what an independent broker-dealer can and should be expected to do. In my opinion, it would be unreasonable for a broker-dealer to demand that an independent advisor turn over his personal devices where the advisor has already represented that he does not have any customer information in his possession.

---

[2] Ibid at 9.

54. Further, in my opinion, it is entirely reasonable that confirmation would be sought by a member of LPL's legal department, rather than Mr. Kenoyer's Series 24 supervisor, in light of the fact that there was pending litigation.

55. In my opinion, and based on the facts known to me, LPL has at all times acted fully in accord with its supervisory obligations under FINRA rules.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct. Executed this 3rd day of April 2025, in Ranchos de Taos, New Mexico.



James Reilly